# EXHIBIT 2

CHHABRA LAW FIRM, PC
ROHIT CHHABRA (SBN 278798)
Email: rohit@thelawfirm.io
257 Castro Street Suite 104
Mountain View, CA  94041
Telephone: (650) 564-7929

**Attorney for Plaintiffs**
Open Source Security Inc. &
Bradley Spengler

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| OPEN SOURCE SECURITY INC. and BRADLEY SPENGLER<br><br>Plaintiff,<br><br>v.<br><br>BRUCE PERENS, and Does 1-50,<br><br>Defendants. | ) Case No.: 3:17-cv-04002-LB<br>)<br>)<br>) **DECLARATION OF EXPERT WITNESS**<br>) **WILLIAM H.G. NORMAN IN SUPPORT**<br>) **OF PLAINTIFFS' OPPOSITION TO**<br>) **DEFENDANT'S MOTION FOR**<br>) **ATTORNEYS' FEES**<br>)<br>)<br>)<br>) Hearing Date: April 5, 2018<br>) Time: 9:30 a.m.<br>) Location: Courtroom C, 15th Floor<br>) Judge: Hon. Laurel Beeler<br>)<br>)<br>) |

3:17-CV-04002-LB

Decl. of William H.G. Norman

1208624.1

## DECLARATION

I, William H.G. Norman, declare:

1.        I am submitting this declaration in support of Plaintiffs' Opposition to Defendant's Motion for Attorneys' Fees.  I have been practicing commercial litigation in the Bay Area for almost 47 years, I have tried over 75 cases to conclusion, have handled more than 15 anti-SLAPP matters, and have on several prior occasions testified as an expert witness on attorneys' standard of care and fee reasonableness, including complex commercial case management issues.

2.        I am familiar with the standards of practice in the San Francisco Bay Area for anti-SLAPP motions including the staffing and the appropriate range of reasonable fees to be charged. I was not provided any documents that are currently under-seal with this Court and have not been told of the hourly rates charged by Defendant's counsels.  Neither Plaintiffs nor their attorneys, representatives, or agents have ever asked me to modify or revise my assessment submitted here.

## BACKGROUND

3.        I graduated from Williams College and University of Virginia Law School and have been licensed to practice law in Virginia (1968) and California (1971); I have been admitted to practice before numerous Federal Courts in California, including the Northern District.

4.        I worked as an attorney at Bronson, Bronson and McKinnon LLP from 1971 to 1999. Many of my partners there were appointed to the bench including U.S. District Court

-1-

1208624.1 Decl. of William H.G. Norman

3:17-CV-04002-LB

Judges Hon. Charles Legge and Hon. Fern Smith; five other partners were appointed to the California Superior Court.  I was a partner at Bronson, Bronson and McKinnon until the firm closed in 1999. I then became a partner at Cooper, White & Cooper.  I have handled complex commercial litigation at both firms.

**OPINION REGARDING CLAIMED ATTORNEYS' FEES**

5.      I have made an independent assessment after reviewing the publicly available pleadings in this case, including the briefs and orders.

6.      After thoroughly reviewing the pleadings, it is my opinion that this matter did not present any complex legal or factual issues.  The specific and rather narrow question presented was whether Defendant's statements were defamatory when he asserted that Plaintiffs were in violation of the GPL.  Even more narrowly, the real issue was whether the statements were non-actionable because they were explicitly stated to be opinions on the face of the publications.  This does not call for any sophisticated intellectual property analysis at all, merely the simple point that opinions are excluded from defamation claims.  Therefore, any experienced non-intellectual property attorney could have provided the Defendants with adequate representation at non-complex commercial litigation rates which are far below what mega firm IP partners charge in billion dollar patent disputes.  Further, from what I can tell, this Court also did not determine any complex legal issues throughout this proceeding; it merely concluded that Plaintiffs had not proven a reasonable probability of success in overcoming the defense of opinion immunity from defamation claims.

7.    It is my opinion that the attorneys' fees claimed by Defendant are excessive and unreasonable for the following reasons:

(a)    First, the hourly rates for similar matters as the issues presented here should not be more than the following ranges of reason for the following categories of timekeepers:

| Title | Maximum Hourly Rate |
|---|---|
| Partner (20+ years experience) | $475 - $550 |
| Partner (10 - 15 years experience) | $425 - $450 |
| Associate (1+ years experience) | $230 - $240 |
| Associate (less than 1 year experience) | $210 - $215 |
| Law school graduate, but not-admitted, Law Clerk/Intern | $180 - $195 |
| Paralegal | $190 - $220 |

(b)    Second, Defendant's staffing was excessive and unreasonable.  In my opinion, the proper staffing should have been one senior or mid-level partner, one associate, and one paralegal.   More timekeepers, especially those duplicating other timekeepers in the same levels, are extremely inefficient.  Confusion, extra management time by the team leader, and excess intra-office conferencing result in greater cost and they often compromise the overall effort.

-3-

(c)     Third, after thoroughly reviewing the pleadings and motions filed in this matter,

my independent assessment as to the reasonable number of hours for each task is

described below:

| | Task | Hours Claimed | Estimated Reasonable Hours | Basis of Opinion |
|---|---|---|---|---|
| 1. | First Anti-SLAPP Motion | 137.9 | **95 - 110** | This was a simple defamation case, not calling for an Intellectual Property analysis, one mostly dealing with whether Defendant's statements were immune lay opinions or rather were expert opinions based on unstated or implied facts. |
| 2. | Second Anti-SLAPP Motion | 77.6 | **30 - 60** | This was largely a duplication of the first motion; to the extent there was any additional issue it was quite limited, essentially whether these had been a prior admission of falsity (which the Court quickly dismissed). |
| 3. | Second Anti-SLAPP Reply | 109.5 | **20 - 25** | This involved a simple legal argument distinguishing the *Coastal Abstract* case. |
| 4. | Response to Plaintiffs' Supplemental Brief in Opposition to Anti-SLAPP Motion | 19.6 | **6 - 10** | This involved a simple legal argument to distinguish the *Overstock* case. |
| 5. | Opposition to Motion for Partial Summary Judgment | 87.5 | **30 - 40** | This was a simple ten page brief and accompanying declaration that an issue of fact existed as to Defendant's belief in the truth of his statements.  The same facts were mostly repeated from the anti-SLAPP motion, and the arguments were mostly what had already been argued in the anti-SLAPP motions. |
| 6. | Surreply to Motion for Partial Summary Judgment | 29.2 | **10 - 15** | This was a simple explanation by Defendants of the July 9-10 time sequence in their blog posts. |
| | Combined hearing on Anti-SLAPP Motion, Motion to | 141.6 | **6** | What is reasonable is maybe three hours (including travel time) for one attorney, but a maximum of six hours for two attorneys. |

| | | | | |
|---|---|---|---|---|
| 7. | Dismiss, and hearing of Motion for Partial Summary Judgment | | | What was billed was <u>24 times that and was for more time than had been billed for preparing the motion itself</u>. |
| 8. | Case Management | 86.9 | 30 - 40 | This was for half of the joint reports to the Court, plus routine Stipulations and Motion to Continue, etc. Based on the limited substance of the reports, it is unreasonable to claim 86.9 hours just for the one half written by the defense. |
| 9. | Settlement | 12.3 | 4 | This relates to the negotiation of the case dismissal terms, so it is far too high and is unreasonable. |
| 10. | Motion for Attorneys' Fees under Anti-SLAPP law | 131.8 | 40 – 50 | Billing as much time for calculating fees for making the anti-SLAPP motion as was charged for actually preparing the motion is excessive.  My reasonable estimate includes and allows time for review, redaction, and sealing effort. |
| 11. | **Total Estimated Hours without Summary Judgment motions** | **231 – 305** | | |
| 12. | **Total Estimated Hours With Summary Judgment Motions** | **271 – 360** | | |

8.  Plaintiffs' motion for partial summary judgment was based on a reasonable legal theory that there was no triable issue of fact as to whether the statement was an opinion since Defendant's comment on Slashdot website, arguably, seemed as an admission that Plaintiffs agreement was not in violation of the GPL.  Plaintiffs also argued that a recitation in Defendant's statements that they were "opinions" did not end the debate because Defendant was an expert which a reasonable person would believe was basing his assertions on unstated or implied facts and information.  Thus, the arguments in the papers to the partial summary judgment motion were substantially similar to those presented in the anti-SLAPP motions.  In light of that significant overlap, the time and fees reasonably required to

-5-

1  defend the motion for summary judgment (which was not decided by the Court) were

2  minimal:  repetition of the point that if the statements were not opinions the debate stops

3  there.

4

5  9.      Clerical and administrative charges are not customarily or reasonably billed either in the

6  context of fee shifting or in the context of the anti-SLAPP statute.  Therefore, secretarial

7  work such as calls to clerks, filing, calendaring, document or file organization, data entry

8  into spread sheets, and preparing routine documents should not reasonably be charged or

9  requested from the Court.

10

11

12  10.     In my experience and understanding, the purpose of the anti-SLAPP authorization of

13  attorneys' fees is to protect the client, not the lawyer.  If the client is not at risk for payment,

14  then satisfying the purpose of the anti-SLAPP statute does not require that a success fee be

15  awarded.

16

17

18      I declare under penalty of perjury under the laws of the State of California that the above

19  statements are true and correct as to facts I believe to be true, of the work I have done, and of my

20  opinions in this matter.

21

22  Date: March 7, 2018

23

24

25                                              **William H.G. Norman**

26

27

28

-6-

# EXHIBIT 3







**Partner**
San Francisco Office
wnorman@cwclaw.com
415-433-1900

**Practices**
Litigation
Business Litigation
Professional Liability
Pipeline Safety Group
Energy
Labor & Employment
Real Estate Solutions
Environmental

# William H.G. Norman

Bill Norman started practicing law in California after extensive experience as an officer in the U.S. Army, first as an infantry platoon leader on the DMZ and later as a trial attorney for both criminal prosecutions and their defense. Then, after serving for many years as a trial partner at Bronson, Bronson & McKinnon, he joined Cooper, White & Cooper LLP in 1999. He is a highly experienced business trial lawyer with emphasis in real property, wrongful termination, trade secret, professional liability, partnership/LLC disputes, probate litigation (including undue influence claims), and pipeline safety issues. He has tried over 70 lawsuits to successful conclusions, the majority of them jury trials, with the result that he has been elected to the American Board of Trial Advocates.

At Cooper, White & Cooper, Mr. Norman chairs its Real Estate Solutions Group, and  regularly handles a variety of complex commercial lawsuits.  He frequently authors practice alerts posted on the Firm's website, such as "Are There Limits on Attorney Fee Awards for a Prevailing Party in Real Estate or Partnership Litigation?", "Waivers in Guaranties and Loan Agreements", "Undue Influence Principles at Work in Attacking Financial Transfers," and "The Foolproof Way To Select A Mediator According To The Experts".  He has spoken to a wide variety of professional groups, such as the annual CEB seminar on Real Property Remedies, the annual California Bankruptcy Forum, the international LAW convention, PLI, the Annual IPA Commercial Roundtable Forum, several regional offices of JAMS judges, and the Securities Roundtable Forum.  He has appeared on national television to discuss constitutional issues and he has served as an expert witness on numerous litigation-related issues, including trial strategy and the reasonableness of legal fees.

**Examples of Recent Notable Results**

- Following a month-long Superior Court trial, defeated a claim against our client, the founder of four elder care facilities, that he had personally guaranteed his partners a multi-million dollar return irrespective of project success. At trial they described vivid recollections of key conversations with our client to that effect but under cross examination it was revealed that they actually remembered nothing. The trial result included our client obtaining ownership of their partnership interests plus hundreds of thousands of dollars in monetary recovery on his own claims against them for their breaches of fiduciary duty. (2015-2016)

- Won a seven figure Superior Court judgment on behalf of a real estate investor client against his Russian partner, for Elder Abuse and breaches of fiduciary duty. The defendant partner persuaded our client to enter into an oral partnership the terms which called for her use of our client's funds to purchase apartment complexes in California plus raw land in Arizona without him being on title. She then proceeded to enter into an escrow for resale without notifying him, added other partners without his consent, and engaged in bank fraud using a partnership account. (2015-2016)

- Obtained a payment of over $36 million to our clients, four heirs of a steel magnate's fortune, following prosecution of a probate court action against their step-mother which sought return of the father's separate property assets on the contention that the step-mother had caused the clients' Alzheimer's-ridden father to make transfers under conditions of undue influence and elder abuse (2014).

- Represented the buyer of a prominent restaurant property in a lawsuit against the sellers and their real estate broker for bad faith and fraud. After a highly successful settlement with the broker defendant, the case proceeded through a three-week jury trial against the sellers with a jury determination in the client's favor of bad faith and intentional concealment by the sellers (2014).

- Successfully obtained a very substantial recovery for lender liability misconduct including fraud against the world's second largest bank on behalf of a national pension fund client whose $100 million portfolio had been significantly invested by the bank in Lehman bonds. Evidence showed that the bank bought Lehman bonds for the client's account and recommended holding them without disclosing that the bank itself was actually unloading Lehman positions just a few months before Lehman's bankruptcy (2013).

- On behalf of a national bank client, successfully defeated a significant lender liability claim and obtained a $1.7 million recovery for the client on a related cross-complaint against a commercial loan guarantor.

- Successful testimony as an expert witness before a San Francisco Superior Court jury and court on the unreasonableness of over $13,000,000 in attorneys fees charged by a large national law firm to its clients for trying a 3 month jury trial. The law firm contended that the complex trade secret and international money laundering trial was litigated in four different states and several countries such that the fees were justified, but Mr. Norman's expert testimony was cited repeatedly as a major basis for the determination that the law firm's fees should be reduced by over $ 5.2 million because of improper staffing, discovery abuses, and poor trial counsel leadership. (2013)

- Successful defense of numerous triple net lease fraud cases set for separate jury trials in Seattle, in which the defendant clients were accused of failing to disclose overlapping common ownership of the tenants and the sellers, weaknesses the financial condition of the lease guarantors, dual agency, and the decreased value of the space on the open market if the underlying restaurant businesses in various cities in Texas were to fail, as they later did. (2012-2013)

- In a trial featuring the $80 million sale of an energy industry company, represented the president in claims against other stockholders for breach of fiduciary duty, contract violations, and unjust enrichment. Our client obtained all relief requested plus attorneys fees as the party prevailing on issues that included alleged asbestos risk coverups, circumstances in which the transactional lawyers on both sides of the buyout gave advice to both sides of the deal, and the validity of certain EBITDA valuations. The numerous complex legal questions included whether the time periods set forth in one contract for the exercise of certain stock purchase "put" rights could be changed without the consent of all signatories. Our client argued successfully that they could be so changed because the contract generically referenced the "time periods" set forth in a second contract between different parties and that second contract contained a separate clause permitting a subsequent amendment (2012).

- Following a hard-fought trial, obtained an award valued at more than $30 million for clients who had sued for partnership dissolution and breaches of fiduciary duty. Extensive cross-claims against our clients for their alleged breaches of fiduciary duty were defeated, and almost $900,000 in attorney's fees and costs were awarded to them as prevailing parties. Some of the interesting issues at trial included whether partners' fiduciary duties to each other are modified after a Notice of Dissolution in advance of a final wind-up, so as to permit solicitations of partnership employees and clients or to permit the forming of a competing business during the dissolution process (2012).

- Obtained a judgment dismissing a complaint and recovered substantial prevailing party attorneys fees for a client who had served as Executor of rock promoter Bill Graham's estate.  The client was sued by Graham's heirs for an alleged secret diversion of intellectual property from the estate to a corporation in which the Executor was a significant shareholder.  The successful result was achieved with an anti-SLAPP motion in Federal Court (2011).

- After a two-month jury trial on breach of fiduciary duty and punitive damage claims, obtained a highly successful result for a nationally prominent real estate client.

- Successful defense of a month-long jury trial in which a key issue was whether a buyer of commercial real estate property may sue his real estate broker if he himself was a licensed broker charged with due diligence responsibility (2010).

- In a lengthy Superior Court trial, won a $7 million judgment plus $1 million in attorneys fees for an individual plaintiff in a case involving the theft of a partnership opportunity by a defendant general partner in the context of a mortgage backed security transaction.

- After a month-long trial, won a $7.5 million award for a minority partner against its general partner in a cable TV investment where evidence showed extensive self-dealing by the general partner.

- On behalf of a nationally prominent, high end restaurant client, sued a luxury hotel defendant for $8 million and obtained a very substantial result on a case arising out of a breach of a License Agreement where the evidence showed defective Notices of Default as well as active interference with the client's right to cure (2009).

- Obtained a $12 million judgment for fraud on behalf of commercial real estate investor clients against their former LLC Managing Member and his affiliated general contractor entities where the evidence showed false representations as to matching capital contributions, extensive self dealing, commingling of funds with other projects, phony land option payments, and undisclosed partnerships between the Managing Member and certain third party sellers (2009).

- Successful defense, through a six-week trial, of a nationally prominent real estate brokerage firm, for alleged intentional fraud, breaches of fiduciary duty, and violations of BPC § 17200. The case arose out of five triple net lease investments (retail gasoline stations) and the claims related to alleged misrepresentations of the income stream, financial strength of guarantors, and operator track records (2008).

- In a two-week trial, successfully defeated a $2.5 million breach of contract and wrongful termination claim made by an East Coast alcoholic beverage distributor against a nationally prominent winery/movie producer client.

- Obtained a defense judgment after trial for an international client in a case involving alleged misuse of overseas letters of credit by the client on a complex commercial transaction where over $50 million in damages were claimed.

- Won a $1.3 million Award after trial for a national Real Estate Investment Trust client against the seller and builder of a large apartment complex in respect to construction defects, including multiple *Aas* issues.

- Successfully defended a California Superior Court lawsuit through trial against claims seeking an alter ego judgment against an individual client by piercing the corporate veil of his affiliated corporation and obtained substantial attorneys fees in favor of the individual client.

- Obtained a judgment in favor of our client after trial in a dispute between two partners arising out of extensive investments in Southern California commercial real property, with cross claims for breach of fiduciary duty, fraud, conversion, accounting, contempt of court, and domestic violence.

- Successfully defended over a three-year period the nation's largest petroleum pipeline owner in 24 personal injury and wrongful death lawsuits, including cases involving five deaths and four serious burns arising out of a fire and explosion that occurred on a high pressure petroleum line in which failures to locate and mark the line and violations of California's Underground Service Alert ("One Call") statute were alleged. DOT enforcement actions, OSHA citations, governmental entity immunities, complex indemnity issues, California State Fire Marshall investigations, and District Attorney charges were also involved. Many codefendants were convinced to contribute towards overall settlements in the range of $100 million (2006-2009).

- Secured a highly successful result following trial in a breach of fiduciary duty dispute between a prominent real estate developer client and one of its minority shareholders.

- Obtained a defense award after trial for a restaurant client accused of violating numerous covenants in its lease.

- Won a $400,000 judgment after trial for an individual client wrongfully accused of real estate partnership fraud.

- Obtained a defense award in favor of a nationally prominent client in an arbitration involving non-disclosure of an underground storage tank.

- Continuing successful litigation representation and counseling of parties to distressed real property development projects as triggered by the current credit crisis, including lenders, borrowers, guarantors, contractors and owners. This includes a wide variety of strategic actions such as pursuing managers who have commingled or stolen funds, developing lender liability claims and defenses, initiating Chapter 11 bankruptcies to preserve negotiating flexibility (and defending against SARE motions to dismiss), asserting and defending claims on personal guaranties, managing internal investor relations, defending mechanics lien foreclosure actions, and negotiating restructuring packages with third party developers (Ongoing).

**Examples of Published Appellate Successes**

- Won a California Appellate case in a published opinion [*Westra v. Marcus & Millichap*, 129 Cal.App. 4th 759] establishing the right to arbitration by a non-signatory agent to a contract containing an arbitration clause.

- Successful determination before the Ninth Circuit Court of Appeals that land sale contracts promoted as passive investments were not securities for purposes of the application of federal securities laws. [*De Luz Ranches v. Coldwell Banker,* 608 F.2d 1297.]

- Successful invalidation in the Court of Appeal of a client's Confession of Judgment. [*Efstratis v. First Northern Bank*, 59 Cal.App.4th 667.]

**Other Successful Representations**

- Successfully defended a nationally prominent winery in resolving claims of TCA contamination and associated product disparagement.

- Continued representation and counseling of clients as to environmental litigation including issues arising out of CERCLA, nuisance, ultrahazardous liability and trespass causes of action.

- Substantial ongoing counseling of general contractor clients in regard to AIA contracts, foreclosure and bankruptcy issues, delay claims, change orders, building damage claims for mediation, and upgrading ADR provisions.

- Successfully defended attorneys in two separate complex cases involving alleged contempt of court.

- Obtained a defense judgment for a nationally prominent freight forwarding company on a wrongful termination claim brought by the company's former president.

- Obtained an eight-figure settlement for a national real estate developer against the alter ego parent of a foreign-owned joint venture partner for breaching a financing commitment on a failed luxury hotel and golf course.

- Obtained six figure judgments against alter ego defendants in two separate cases after piercing their corporate veils.

- Successfully defeated, through a C.C.P. §425.16 Anti-SLAPP motion, numerous malicious prosecution and interference with contract claims made against an attorney client, and won a substantial award of attorneys fees for the client.

- Won a $750,000 summary judgment in federal court for a national building management firm on a fidelity bond claim against an insurance company for a bad faith denial of coverage of claims arising when a top executive of the client in Los Angeles took kickbacks from third party vendors.

- Successful defense of psychologists and clergymen in numerous lawsuits for alleged breaches of confidentiality.

- Successfully defended and prosecuted numerous lawsuits for alleged breaches of fiduciary duty on the part of majority owners of corporations and limited liability companies with respect to their relationships to minority members or shareholders.

- Achieved numerous highly successful results, including injunctive relief and a seven-figure recovery, in several major trade secret lawsuits on behalf of a national real estate broker against agents and managers who departed with customer lists and proprietary information.

- Negotiated a $1.1-million settlement for a plaintiff lender in an action against its real estate developer and its contractors for construction defects in a large apartment complex.

- Represented plaintiffs in a multimillion-dollar settlement arising out of deaths in the Loma Prieta earthquake caused by a commercial building's lack of seismic safety.

- Successfully defended a large real estate developer in a class action construction defect case in Contra Costa County.

- Successfully defended a Bay Area-based REIT in a $12 million construction defect lawsuit for developer liability on a large peninsula condominium project, settling the case with a contribution equal to less than half of expected trial costs.

- Continuous advice, counseling, and litigation defense of partnership disputes, including litigation and mediation of issues involving departing partners taking clients and files.

- Successful defense of a client on a project delay claim arising out of construction of the Grand Coulee Dam.

- Successful defense of numerous real estate developers in over 25 cases alleging construction defects, including foundations, roofing issues, hardboard siding, beetle-infested hardwood floors, and faulty jacks.

- Numerous successful trials and arbitrations defending real estate brokers, attorneys, psychologists, clergymen, engineers, and appraisers against claims of professional negligence and fraud.

- Successfully defended the project engineer on professional negligence claims arising out of construction of the Black Butte Dam.

- Obtained through litigation a $1-million reduction in rent on behalf of an engineering company tenant on the grounds that the landlord's 1927 building lacked seismic safety.
- Successfully defended a REIT in a suit for breach of a written loan commitment agreement.
- Successfully represented plaintiffs in several multimillion lawsuits for fraud in connection with mortgage conduits.
- Won a summary judgment for a client seeking a critical prescriptive easement for its commercial property.

**Litigation Philosophy**

Mr. Norman's litigation philosophy is to be aggressive in representing a client's interests while continuing to look for creative and cost-effective solutions. As a professional mediator who successfully completed the national Academy of Attorney Mediators program, he understands that early resolution of disputes is preferable, though ADR efforts are best pursued after solid preparation and from positions of strength. Litigation budgets are a desirable way to address client expectations and to control legal costs. Clients should be kept closely advised in detail. All client inquiries should be responded to immediately, and certainly no later than the same business day.

**Professional and Community Activities**

Mr. Norman has spoken widely to a variety of professional audiences, including Continuing Education of the Bar (1999 - present, panelist in CEB's Real Property Remedies Seminar), the California Bankruptcy Forum, Lorman, and Practicing Law Institute seminars, law schools, trade associations, and state conventions. He has appeared on national television (ABC's "20/20") to discuss constitutional issues, and he has published numerous articles on a wide variety of current issues. These include articles appearing in *California Lawyer*, *The Recorder*, *The Daily Journal*, *CPA Managing Partner Report*, *Alternatives*, *Pacific Builder*, *ABTL Report*, *Financial Planner Magazine*, *Realtor Magazine*, *Defense Research Institute Journal*, *American Agent & Broker*, *California Real Estate Journal*, and *Corporate Real Estate Executive*.

**Personal**
Born - Colorado Springs, Colorado
B.A. - Williams College
LL.B. – University of Virginia

**cwclaw.com**

# EXHIBIT 4

# USAO ATTORNEY'S FEES MATRIX — 2015-2018

*Revised Methodology starting with 2015-2016 Year*

Years (Hourly Rate for June 1 – May 31, based on change in PPI-OL since January 2011)

| Experience | 2015-16 | 2016-17 | 2017-18 |
|---|---|---|---|
| 31+ years | 568 | 581 | 602 |
| 21-30 years | 530 | 543 | 563 |
| 16-20 years | 504 | 516 | 536 |
| 11-15 years | 455 | 465 | 483 |
| 8-10 years | 386 | 395 | 410 |
| 6-7 years | 332 | 339 | 352 |
| 4-5 years | 325 | 332 | 346 |
| 2-3 years | 315 | 322 | 334 |
| Less than 2 years | 284 | 291 | 302 |
| Paralegals & Law Clerks | 154 | 157 | 164 |

*Explanatory Notes*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia (USAO) to evaluate requests for attorney's fees in civil cases in District of Columbia courts.  The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees.  *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act).  The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, or by other Department of Justice components, or in other kinds of cases.  The matrix does **not** apply to cases in which the hourly rate is limited by statute.  *See* 28 U.S.C. § 2412(d).

2.  A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases.  *See, e.g., Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010).  Consistent with that definition, the hourly rates in the above matrix were calculated from average hourly rates reported in 2011 survey data for the D.C. metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index.  The survey data comes from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics.  The PPI-OL index is available at http://www.bls.gov/ppi.  On that page, under "PPI Databases," and "Industry Data (Producer Price Index - PPI)," select either "one screen" or "multi-screen" and in the resulting window use "industry code" 541110 for "Offices of Lawyers" and "product code" 541110541110 for "Offices of Lawyers."  The average hourly rates from the 2011 survey data are multiplied by the PPI-OL index for May in the year of  the update, divided by 176.6, which is the PPI-OL index for January 2011, the month of the survey data, and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

3.  The PPI-OL index has been adopted as the inflator for hourly rates because it better reflects the mix of legal services that law firms collectively offer, as opposed to the legal services that typical consumers use, which is what the CPI-

Legal Services index measures. Although it is a national index, and not a local one, *cf. Eley v. District of Columbia*, 793 F.3d 97, 102 (D.C. Cir. 2015) (noting criticism of national inflation index), the PPI-OL index has historically been generous relative to other possibly applicable inflation indexes, and so its use should minimize disputes about whether the inflator is sufficient.

4.    The methodology used to compute the rates in this matrix replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey v. Northwest Airlines, Inc.* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985), and then adjusted those rates based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington-Baltimore (DC-MD-VA-WV) area. Because the USAO rates for the years 2014-15 and earlier have been generally accepted as reasonable by courts in the District of Columbia, see note 9 below, the USAO rates for those years will remain the same as previously published on the USAO's public website. That is, the USAO rates for years prior to and including 2014-15 remain based on the prior methodology, *i.e.*, the original *Laffey* Matrix updated by the CPI-U for the Washington-Baltimore area. *See Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, --- F. Supp. 3d ---, 2015 WL 6529371 (D.D.C. 2015) and Declaration of Dr. Laura A. Malowane filed therein on Sept. 22, 2015 (Civ. Action No. 12-1491, ECF No. 46-1) (confirming that the USAO rates for 2014-15 computed using prior methodology are reasonable).

5.    Although the USAO will not issue recalculated *Laffey* Matrices for past years using the new methodology, it will not oppose the use of that methodology (if properly applied) to calculate reasonable attorney's fees under applicable fee-shifting statutes for periods prior to June 2015, provided that methodology is used consistently to calculate the entire fee amount. Similarly, although the USAO will no longer issue an updated *Laffey* Matrix computed using the prior methodology, it will not oppose the use of the prior methodology (if properly applied) to calculate reasonable attorney's fees under applicable fee-shifting statutes for periods after May 2015, provided that methodology is used consistently to calculate the entire fee amount.

6.    The various "brackets" in the column headed "Experience" refer to the attorney's years of experience practicing law. Normally, an attorney's experience will be calculated starting from the attorney's graduation from law school. Thus, the "Less than 2 years" bracket is generally applicable to attorneys in their first and second years after graduation from law school, and the "2-3 years" bracket generally becomes applicable on the second anniversary of the attorney's graduation (*i.e.*, at the beginning of the third year following law school). *See Laffey*, 572 F. Supp. at 371. An adjustment may be necessary, however, if the attorney's admission to the bar was significantly delayed or the attorney did not otherwise follow a typical career progression. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 60-61 (D.D.C. 2013) (same). The various experience levels were selected by relying on the levels in the ALM Legal Intelligence 2011 survey data. Although finer gradations in experience level might yield different estimates of market rates, it is important to have statistically sufficient sample sizes for each experience level. The experience categories in the current USAO Matrix are based on statistically significant sample sizes for each experience level.

7.    ALM Legal Intelligence's 2011 survey data does not include rates for paralegals and law clerks. Unless and until reliable survey data about actual paralegal/law clerk rates in the D.C. metropolitan area become available, the USAO will compute the hourly rate for Paralegals & Law Clerks using the most recent historical rate from the USAO's former *Laffey* Matrix (*i.e.*, $150 for 2014-15) updated with the PPI-OL index. The formula is $150 multiplied by the PPI-OL index for May in the year of the update, divided by 194.3 (the PPI-OL index for May 2014), and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

8.    The USAO anticipates periodically revising the above matrix if more recent reliable survey data becomes available, especially data specific to the D.C. market, and in the interim years updating the most recent survey data with the PPI-OL index, or a comparable index for the District of Columbia if such a locality-specific index becomes available.

9.    Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the USAO as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area. *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). Most lower federal courts in the District of Columbia

have relied on the USAO's *Laffey* Matrix, rather than the so-called "*Salazar* Matrix" (also known as the "LSI Matrix" or the "Enhanced *Laffey* Matrix"), as the "benchmark for reasonable fees" in this jurisdiction. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *see, e.g., Joaquin v. Friendship Pub. Charter Sch.*, 188 F. Supp. 3d 1 (D.D.C. 2016); *Prunty v. Vivendi*, 195 F. Supp. 3d 107 (D.D.C. 2016); *CREW v. U.S. Dep't of Justice*, 142 F. Supp. 3d 1 (D.D.C. 2015); *McAllister v. District of Columbia*, 21 F. Supp. 3d 94 (D.D.C. 2014); *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 297 F.R.D. 4, 15 (D.D.C. 2013); *Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013); *Fisher v. Friendship Pub. Charter Sch.*, 880 F. Supp. 2d 149, 154-55 (D.D.C. 2012); *Sykes v. District of Columbia*, 870 F. Supp. 2d 86, 93-96 (D.D.C. 2012); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 40-49 (D.D.C. 2011); *Hayes v. D.C. Public Schools*, 815 F. Supp. 2d 134, 142-43 (D.D.C. 2011); *Queen Anne's Conservation Ass'n v. Dep't of State*, 800 F. Supp. 2d 195, 200-01 (D.D.C. 2011); *Woodland v. Viacom, Inc.*, 255 F.R.D. 278, 279-80 (D.D.C. 2008); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 148-50 (D.D.C. 2007). *But see, e.g., Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13-15 (D.D.C. 2000). Since initial publication of the instant USAO Matrix in 2015, multiple courts similarly have employed the USAO Matrix rather than the *Salazar* Matrix for fees incurred since 2015. *E.g.*, *Electronic Privacy Information Center v. United States Drug Enforcement Agency*, --- F. Supp. 3d ---, 2017 U.S. Dist. LEXIS 111175, at *17 (D.D.C. 2017) ("After examining the case law and the supporting evidence offered by both parties, the Court is persuaded that the updated USAO matrix, which covers billing rates from 2015 to 2017, is the most suitable choice here.") (requiring re-calculation of fees that applicant had computed according to *Salazar* Matrix); *Clemente v. FBI*, No. 08-1252 (BJR) (D.D.C. Mar. 24, 2017), slip op. at 9-10 (applying USAO Matrix, as it is "based on much more current data than the *Salazar* Matrix"). The USAO contends that the *Salazar* Matrix is fundamentally flawed, does not use the *Salazar* Matrix to determine whether fee awards under fee-shifting statutes are reasonable, and will not consent to pay hourly rates calculated with the methodology on which that matrix is based.

# EXHIBIT 5

**JUDICIARY SALARY PLAN**
**San Jose-San Francisco-Oakland, CA - Table SF**
**39.28% Locality Payment Included**
**Effective January 8, 2018**

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $26,164 | $27,040 | $27,910 | $28,775 | $29,646 | $30,154 | $31,013 | $31,883 | $31,916 | $32,734 |
| 2 | $29,417 | $30,118 | $31,091 | $31,916 | $32,278 | $33,228 | $34,178 | $35,128 | $36,078 | $37,028 |
| 3 | $32,097 | $33,167 | $34,236 | $35,306 | $36,376 | $37,445 | $38,515 | $39,585 | $40,654 | $41,724 |
| 4 | $36,033 | $37,234 | $38,434 | $39,635 | $40,836 | $42,036 | $43,237 | $44,437 | $45,638 | $46,838 |
| 5 | $40,315 | $41,659 | $43,003 | $44,347 | $45,691 | $47,035 | $48,379 | $49,723 | $51,067 | $52,411 |
| 6 | $44,937 | $46,435 | $47,932 | $49,429 | $50,926 | $52,424 | $53,921 | $55,418 | $56,915 | $58,413 |
| 7 | $49,937 | $51,602 | $53,266 | $54,931 | $56,595 | $58,259 | $59,924 | $61,588 | $63,253 | $64,917 |
| 8 | $55,304 | $57,148 | $58,992 | $60,836 | $62,680 | $64,524 | $66,368 | $68,212 | $70,056 | $71,901 |
| 9 | $61,084 | $63,120 | $65,157 | $67,193 | $69,229 | $71,265 | $73,302 | $75,338 | $77,374 | $79,410 |
| 10 | $67,268 | $69,510 | $71,753 | $73,995 | $76,238 | $78,480 | $80,723 | $82,965 | $85,207 | $87,450 |
| 11 | $73,905 | $76,369 | $78,832 | $81,296 | $83,760 | $86,224 | $88,688 | $91,152 | $93,616 | $96,080 |
| 12 | $88,582 | $91,535 | $94,488 | $97,440 | $100,393 | $103,346 | $106,298 | $109,251 | $112,204 | $115,157 |
| 13 | $105,335 | $108,846 | $112,357 | $115,868 | $119,380 | $122,891 | $126,402 | $129,913 | $133,425 | $136,936 |
| 14 | $124,475 | $128,624 | $132,773 | $136,922 | $141,071 | $145,220 | $149,369 | $153,519 | $157,668 | $161,817 |
| 15 | $146,415 | $151,296 | $156,176 | $161,056 | $164,200 ** | $164,200 ** | $164,200 ** | $164,200 ** | $164,200 ** | $164,200 ** |
| 16 | $171,718 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |
| 17 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |
| 18 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |

\* Rate limited to the rate for Level III of the Executive Schedule.
\** Rate limited to the rate for Level IV of the Executive Schedule.

# EXHIBIT 6

**JUDICIARY SALARY PLAN**
**Washington-Baltimore-Arlington, DC-MD-VA-WV-PA - Table DCB**
**28.22% Locality Payment Included**
**Effective January 8, 2018**

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $24,086 | $24,893 | $25,694 | $26,490 | $27,292 | $27,760 | $28,551 | $29,351 | $29,382 | $30,134 |
| 2 | $27,081 | $27,726 | $28,623 | $29,382 | $29,715 | $30,589 | $31,464 | $32,338 | $33,213 | $34,087 |
| 3 | $29,548 | $30,533 | $31,518 | $32,502 | $33,487 | $34,472 | $35,457 | $36,441 | $37,426 | $38,411 |
| 4 | $33,172 | $34,277 | $35,382 | $36,488 | $37,593 | $38,698 | $39,803 | $40,909 | $42,014 | $43,119 |
| 5 | $37,113 | $38,351 | $39,588 | $40,825 | $42,063 | $43,300 | $44,537 | $45,775 | $47,012 | $48,249 |
| 6 | $41,369 | $42,747 | $44,126 | $45,504 | $46,882 | $48,261 | $49,639 | $51,017 | $52,396 | $53,774 |
| 7 | $45,972 | $47,504 | $49,036 | $50,569 | $52,101 | $53,633 | $55,165 | $56,698 | $58,230 | $59,762 |
| 8 | $50,912 | $52,610 | $54,308 | $56,005 | $57,703 | $59,400 | $61,098 | $62,796 | $64,493 | $66,191 |
| 9 | $56,233 | $58,108 | $59,983 | $61,857 | $63,732 | $65,606 | $67,481 | $69,355 | $71,230 | $73,105 |
| 10 | $61,926 | $63,991 | $66,055 | $68,119 | $70,184 | $72,248 | $74,312 | $76,377 | $78,441 | $80,505 |
| 11 | $68,036 | $70,304 | $72,573 | $74,841 | $77,109 | $79,377 | $81,645 | $83,914 | $86,182 | $88,450 |
| 12 | $81,548 | $84,266 | $86,984 | $89,703 | $92,421 | $95,139 | $97,858 | $100,576 | $103,294 | $106,012 |
| 13 | $96,970 | $100,203 | $103,435 | $106,668 | $109,900 | $113,132 | $116,365 | $119,597 | $122,830 | $126,062 |
| 14 | $114,590 | $118,410 | $122,230 | $126,049 | $129,869 | $133,689 | $137,508 | $141,328 | $145,148 | $148,967 |
| 15 | $134,789 | $139,282 | $143,774 | $148,267 | $152,760 | $157,253 | $161,746 | $164,200 ** | $164,200 ** | $164,200 ** |
| 16 | $158,082 | $163,352 | $168,622 | $173,892 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |
| 17 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |
| 18 | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * | $174,500 * |

\* Rate limited to the rate for Level III of the Executive Schedule.

\*\* Rate limited to the rate for Level IV of the Executive Schedule.

# EXHIBIT 7

**Fee Calculation Worksheet**

Percentage of work performed (based on Timekeeper Records, excluding sanctions). See

Chhabra Decl. _____

| Resource Name | Hours Claimed (with mathematical errors) | Corrected Claimed Hours | Percentage Claimed (with mathematical errors) | Percentage Claimed Corrected Calculations |
|---|---|---|---|---|
| H. Meeker | 8.9 | 7.3 | 1% | 1.1% |
| M. Hansen | 146.3 | 109.3 | 17.7 % | 17% |
| C. Galliano | 414.7 | 330.7 | 50.2% | 51.5% |
| E. Ormsby | 131.0 | 100.2 | 15.8% | 15.6% |
| M. Rhoades | 83.1 | 65.9 | 10.1% | 10.3% |
| D.Diaz | 41.1 | 27.6 | 5% | 4.3% |
| J. Santillana | 1.3 | 1.3 | 0.2% | 0.2% |
| Total | **826.4** | **642.3** | **100** | **100** |

Reasonable Hours (using Percentage Claimed Corrected, and Mr. Norman's estimated

reasonable hours range):

| Resource Name | Percentage Claimed Corrected | Hours Range (with Summary Judgment Motions) |
|---|---|---|
| H. Meeker | 1.1% | 3.1 - 4 |
| M. Hansen | 17% | 46.1- 61.2 |
| C. Galliano | 51.5% | 139.2 - 185.3 |
| E. Ormsby | 15.6% | 42.2 – 56.2 |
| M. Rhoades | 10.3% | 28.2 - 37.1 |
| D.Diaz | 4.3% | 11.6 -15.5 |
| J. Santillana | 0.2% | 0.6 - 0.7 |
| **Total** | **100** | **271 - 360** |

Reasonable Fees:

| Resource Name | Hours Range (with Summary Judgment Motions) | Fee range based on Mr. Norman's Fee Estimate (lower limit) | Fee range based on Mr. Norman's Fee Estimate (upper limit) | Fee range Based on Laffey Matrix (SF Bay) |
|---|---|---|---|---|
| H. Meeker | 3.1 - 4 | $1,472.5 - $1,900 | $1,705 - $2,200 | $1,832 - $2,364 |
| M. Hansen | 46.1- 61.2 | $19,592.50 - $26,010 | $20,745 - $27,540 | $23,372.70 - $31,028.40 |
| C. Galliano | 139.2 - 185.3 | $29,232 - $38,913 | $29,928 - $39,839.50 | $36,331.20 - $48,363.30 |
| E. Ormsby | 42.2 – 56.2 | $7,596 - $10,116 | $82,29 - $10,959 | $7,216.20 - $9,610.20 |
| M. Rhoades | 28.2 – 37.1 | $5,076 - $6,678 | $5,499 - $7,234.50 | $4,822.20 - $6,344.10 |
| D.Diaz | 11.6 -15.5 | $2,204 - $2,945 | $2,552 - $3,410 | $1,983.60 - $2,650.50 |
| J. Santillana | 0.6 - 0.7 (using claimed hourly rate $125) | $75- $87.5 | $75-$87.5 | $75-$87.5 |
| **Total** | **271 - 360** | **$65,248 - $86,649.5** | **$68,733 – $91,270.5** | **$75,633 - $100,448** |